**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA
Wheeling**

**JAMES CHAMBERS,**

Plaintiff,

v.

**CIV. ACT. NO. 5:26-CV-60**
Judge Bailey

**MARSHALL COUNTY COAL RESOURCES,
INC.**, a Delaware Corporation,

Defendant.

## ORDER

Pending before this Court is Plaintiff/Counterclaim Defendant James Chambers's Motion to Dismiss Defendant's Fraud Counterclaim (Count I) Pursuant to Fed. R. Civ. P. 9(b) and 12(b)(6) [Doc. 18], filed June 12, 2026. Defendant/Counterclaim Plaintiff Marshall County Coal Resources, Inc.'s Response [Doc. 22] was filed June 25, 2026. Plaintiff/Counterclaim Defendant's Reply [Doc. 23] was filed July 2, 2026. This matter is ripe for adjudication. For the reasons contained herein, the Motion [**Doc. 18**] is denied.

## I. BACKGROUND

Plaintiff owns approximately 100.83 acres of property located at 9696 and 10082 Middle Grave Creek Road in Glen Easton, Marshall County, West Virginia—tax parcels 15-17-8, 15-17-9, and 15-7-10 (hereinafter "Chambers properties"). [Doc. 1 at ¶ 10]. Plaintiff's property includes multiple structures, including fields used as pasture for cattle and hay fields, a residential house and garage, a pole barn, and natural springs and streams. [Id. at ¶¶ 13–16].

According to plaintiff, "[i]n or around 2019, [Marshall County Coal Resources, Inc. ("MCCR")] engaged in longwall coal mining near and underneath the Chambers properties" and states "longwall coal mining caused substantial damage to the land, water, sources, and structures on the Chambers properties." [Id. at ¶¶ 11–12]. Between 2019 and 2021, MCCR is alleged to have "made incomplete and failed attempts to repair land damage." [Id. at ¶ 17]. Plaintiff contends during that time period, "MCCC or MCCR arranged for [plaintiff's] property to be hooked up to water provided by the Public Service District . . . as replacement for the natural water sources, including multiple springs. . . [and] also provided 12 cattle drinkers. . . ."[1] [Id. at ¶ 18]. Further, plaintiff contends that "MCCC or MCCR obtained contractor estimates to repair structure damage at the Chambers properties and made offers of compensation," but the repairs "significantly underestimated the extent of the damage and cost to repair it." [Id. at ¶ 21].[2]

Plaintiff made subsidence damage complaints as to the Chambers properties to the West Virginia Department of Environmental Protection Division of Mining and Reclamation ("WVDEP") on January 20, 2021. See [Doc. 1-1]. The WVDEP investigated those complaints and provided the investigation results to plaintiff on March 25, 2021. [Id.]. The WVDEP inspection report states:

> The property contains multiple fields and cracks and slips are present in all
>
> of the fields. [Plaintiff] states that the company has previously fixed some of

---

[1] It is not entirely clear from the Complaint as to what "MCCC" stands for, as the acronym is never explained. This Court assumes the acronym stands for Marshall County Coal Company.

[2] Plaintiff attached contractor estimates provided in October 2019 and June 2021 to the Complaint as portions of Exhibits B and C. [Docs. 1-2 & 1-3].

the slips and cracks but these areas have since settled/sunk and other areas remain unrepaired.  The company has also provided drinkers for [plaintiff's] cattle after his spring went dry.  Cracks are present in the basement floor of the house and in the block foundation.  The house is noticeably unlevel and cracks have appeared in the bathroom tile.  Both barns on the property are now unlevel and cracks are present in blocks.  These damages and any others fall under presumption of causation as the structures fall inside the 30-degree angle of draw of longwall mining.  The company will have an initial 90-day period to repair, replace, or compensate beginning with delivery of this notice.

[Doc. 1-1 at 4].

Plaintiff alleges MCCR failed to complete repairs within the 90-day period set by the WVDEP inspection report, which ran from February to May 2021, and later sought permit revisions while submitting allegedly undervalued contractor bids and bonds that did not account for the full extent of structural damage. [Doc. 1 at ¶¶ 24–29].  Although MCCR attempted repairs to the land damage beginning around 2019 or 2020, plaintiff asserts WVDEP documented in 2021 and again in 2023 that the repairs were inadequate, leaving unstable slopes, exposed soil, and unresolved land movement.  [Id. at ¶¶ 30–31, 35–36]. Plaintiff also alleges that in 2024 and 2025, MCCR undertook additional repair efforts but allegedly refused to provide detailed engineering plans to plaintiff, and its submitted scope of work lacked technical designs or sufficient detail to demonstrate that the proposed repairs would stabilize the property.  [Id. at ¶¶ 32–41].

The Complaint further alleges that WVDEP merely acknowledged receipt of MCCR's proposed corrective actions without conducting any substantive engineering or geological review of their adequacy. [Id. at ¶¶ 42–44]. According to the allegations, MCCR then treated WVDEP's administrative signoff as though it constituted technical approval, allowing it to avoid meaningful engagement with landowners while implementing repairs that may appear sufficient superficially but fail to restore the property to its pre-subsidence condition. [Id. at ¶¶ 45–48].

Plaintiff goes on to allege that after he demanded through counsel that MCCR cease unauthorized repair work and provide engineered plans demonstrating compliance with West Virginia law governing restoration standards, MCCR allegedly refused to provide such plans and declined to negotiate meaningful revisions to its proposed scope of work. [Id. at ¶¶ 49–50]. The Complaint alleges that, in response to these demands, WVDEP closed plaintiff's land-damage complaint and investigation. [Id. at ¶ 51]. Shortly thereafter, plaintiff alleges MCCR personnel entered the Chambers properties without authorization and attempted to repossess cattle drinkers that had previously been provided as part of a water remedy, successfully removing four (4) of twelve (12) before being stopped by plaintiff. [Id. at ¶ 52]. According to the Complaint, these actions reduced available water access for the cattle, causing overcrowding and creating a risk of inadequate drinking water, and were undertaken maliciously in retaliation against plaintiff. [Id. at ¶¶ 53–54].

The Complaint further alleges that after plaintiff served MCCR with a notice of intent to sue on January 5, 2026, someone intentionally shut off a water meter serving one (1) of his pastures, forcing him to relocate cattle and worsening overcrowding at remaining water sources. [Id. at ¶¶ 55–57]. Although MCCR's counsel admitted company personnel

had entered the property, it denied shutting off the water and later informed plaintiff that MCCR would stop paying for replacement water, allegedly under a pretextual claim of water waste. [Id. at ¶¶ 58–60]. The Complaint contends that these actions were retaliatory and carried out with malicious intent to injure plaintiff or his cattle because he insisted MCCR comply with applicable legal repair standards. [Id. at ¶ 61].

Plaintiff alleges MCCR has failed to comply with their legal obligations in response to the WVDEP's order, including taking meaningful action to prevent, mitigate, or remediate the harm experienced by plaintiff. Plaintiff brings various claims pursuant to the West Virginia Surface Coal Mining and Reclamation Act ("WVSCMRA") and the federal Surface Mining Control and Reclamation Act ("SMCRA"). *See generally* [Doc. 1].

On April 15, 2026, MCCR filed a motion to dismiss. [Doc. 10]. After briefing by the parties, that motion was granted in part and denied in part on May 15, 2026. [Doc. 15]. On May 29, 2026, MCCR filed an Answer to the remaining claims in the Complaint, and a counterclaim for fraud was included alongside MCCR's Answer. [Doc. 16].

MCCR's counterclaim alleges that in 2019, it arranged for the installation of two (2) taps/connections to the Public Service District to replace springs servicing cattle on the Chambers properties. [Doc. 16 at 33]. MCCR also replaced the spring servicing the residence on Parcel No. 15-17-9-1. [Id.]. MCCR paid for all costs associated with the spring work, and also paid subsequent bills for water usage. [Id.]. MCCR later installed five (5) "drinkers" on Parcel No. 15-17-9, such "drinkers" being designed to dispense water when a cow presses its nose against a paddle. [Id.]. MCCR also installed seven (7) drinkers on Parcel No. 15-17-9-10, as well as a "frost-free" hydrant near the barn on that parcel. [Id.].

5

MCCR alleges that, in response to an "astronomical" increase in water bills with respect to the two (2) taps it installed on the Chambers properties, it contacted plaintiff to investigate the properties for a potential leak. [Id. at 34]. No leaks were found. [Id.]. In January of 2025, MCCR representatives went to the Chambers properties to further investigate; however, this time, they did not inform plaintiff beforehand. [Id.]. MCCR representatives observed the "frost-free" hydrant positioned so the water would constantly flow through a hose onto/into the ground. [Id.]. MCCR alleges this positioning was intentional, with the goal of causing MCCR to have to pay for the wasted water. [Id.]. MCCR alleges plaintiff concealed this misuse of water prior to subsequent property visits by MCCR through his prior knowledge of MCCR's intent to visit the property. [Id.].

In October of 2025, MCCR representatives went to the Chambers properties again to investigate a potential leak, and, again, did not inform plaintiff beforehand. [Id.]. MCCR representatives observed the placement of rocks on the paddles of the "drinkers," such placement causing water to constantly flow. [Id.]. MCCR alleges plaintiff placed the rocks in this manner to injure MCCR, with the goal of causing MCCR to have to pay for the wasted water. [Id.]. MCCR alleges plaintiff concealed this misuse of water prior to subsequent property visits by MCCR through his prior knowledge of MCCR's intent to visit the property. [Id.]. MCCR alleges plaintiff has intentionally caused the use of over 9.8 million gallons of water from the PSD connections provided by MCCR, costing MCCR over $74,000.00. [Id. at 35].

## II. LEGAL STANDARD

A complaint must be dismissed if it does not allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570

(2007); *see also **Giarratano v. Johnson***, 521 F.3d 298, 302 (4th Cir. 2008) (applying the *Twombly* standard and emphasizing the necessity of *plausibility*).   When reviewing a motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, the Court must assume all of the allegations to be true, must resolve all doubts and inferences in favor of the plaintiff, and must view the allegations in a light most favorable to the plaintiff. ***Edwards v. City of Goldsboro***, 178 F.3d 231, 243–44 (4th Cir. 1999).

When rendering its decision, the Court should consider only the allegations contained in the Complaint, the exhibits to the Complaint, matters of public record, and other similar materials that are subject to judicial notice.   ***Anheuser-Busch, Inc. v. Schmoke***, 63 F.3d 1305, 1312 (4th Cir. 1995) (*cert. granted*, ***Anheuser-Busch, Inc. v. Schmoke***, 517 U.S. 1206 (1996)).  In ***Twombly***, the Supreme Court noted that "a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do . . ." ***Twombly***, 550 U.S. at 555, 570 (upholding the dismissal of a complaint where the plaintiffs did not "nudge[ ] their claims across the line from conceivable to plausible.").

This Court is well aware that "[m]atters outside of the pleadings are generally not considered in ruling on a Rule 12 motion." ***Williams v. Branker***, 462 Fed.App'x 348, 352 (4th Cir. 2012).  "Ordinarily, a court may not consider any documents that are outside of the Complaint, or not expressly incorporated therein, unless the motion is converted into one for summary judgment." ***Witthohn v. Fed. Ins. Co.***, 164 Fed.App'x 395, 396 (4th Cir. 2006).  However, the Court may rely on extrinsic evidence if the documents are central to a plaintiff's claim or are sufficiently referred to in the Complaint. *Id*. at 396–97.

7

### III. **DISCUSSION**

Here, MCCR's fraud counterclaim lies in alleged actions taken by plaintiff in an effort to thwart MCCR's investigation of increased water usage. MCCR alleges plaintiff took actions ahead of MCCR's inspections of the property to hide the fact that he was intentionally wasting water. Such actions include removing rocks from the "drinkers" and turning off the hydrant in anticipation of MCCR's arrival. [Doc. 22 at 3]. Given the actions allegedly were performed in an effort to conceal plaintiff's waste of water, plaintiff argues the counterclaim is based on fraudulent concealment, and that such a theory renders the claim futile due to a lack of a duty to disclose on plaintiff's part. [Doc. 19 at 6–8]. MCCR, on the other hand, contends the alleged fraud occurred when plaintiff "intentionally wast[ed] millions of gallons of water at MCCR's expense by leaving the water running at all times." [Doc. 22 at 2–4]. MCCR also argues a claim for common law fraud may be based upon deceptive acts to hide information or mislead without the need for an independent duty. [Id. at 3 (citing *United States v. Colton*, 231 F.3d 890, 900 (4th Cir. 2000))].

In reviewing MCCR's allegations and the parties' briefing, it is apparent this Court must first consider whether the counterclaim sounds in fraud or the separate, distinct tort of fraudulent concealment. At the outset, this Court notes defendant's reliance on *United States v. Colton* is misguided, as that was a criminal matter discussing interpretations of federal fraud statutes. 231 F.3d at 900. As such, *Colton* is of no consequence to the issues herein.

"Generally speaking, '[f]raud has been defined as including all acts, omissions, and concealments which involve a breach of legal duty, trust or confidence justly reposed, and which are injurious to another, or by which undue and unconscientious advantage is taken of another." *Kessel v. Leavitt*, 204 W.Va. 95, 127, 511 S.E.2d 752 (1998) (quoting *Stanley v. Sewell Coal Co.*, 169 W.Va. 72, 76, 285 S.E.2d 679, 682 (1981)).

> The essential elements in an action for fraud are: (1) that the act claimed to be fraudulent was the act of the defendant or induced by him; (2) that it was material and false; that plaintiff relied on it and was justified under the circumstances in relying upon it; and (3) that he was damaged because he relied on it.

*Id*. (internal citation and quotation marks omitted).

An action for fraud "can arise by the concealment of truth." *Id*. (internal citation and quotation marks omitted). "Such a basis for a claim of fraud is possible because fraud is the concealment of the truth, just as much as it is the utterance of a falsehood." *Id*. (internal citation and quotation marks omitted). A relaxed pleading standard is applied when alleging fraud by concealment, allowing a plaintiff to rely on information and belief when making allegations. *Corder v. Antero Res. Corp.*, 57 F.4th 384, 402 (4th Cir. 2023). However, this relaxed standard "does not *eliminate* the particularity requirement[]" of Rule 9(b). *Id*. (internal citation and quotation marks omitted) (emphasis in original).

"As a stand-alone action, fraudulent concealment is a common law tort, recognized by the West Virginia Supreme Court of Appeals, consisting of three [(3)] elements: (1) concealment of facts by knowledge or the means of knowledge; (2) duty to disclose;

and (3) intention to mislead or defraud." *Michael v. Estate of Kovarbasich*, 2015 WL 5725814, at *11 (N.D. W.Va. Sept. 29, 2015) (Kaull, M.J.) (citing *Trafalgar House Const., Inc. v. ZMM, Inc.*, 211 W.Va. 578, 584, 567 S.E.2d 294, 300 (2002)), *report and recommendation adopted*, 2017 WL 1197828 (N.D. W.Va. Mar. 31, 2017) (Keeley, J.). If a plaintiff performs an investigation of facts which are easily ascertainable, the plaintiff cannot later complain of detrimentally relying upon fraudulent misrepresentations or concealment by the defendant. *Id.* (citing *Trafalgar House Const., Inc.*).

In order to satisfy these elements, a party must conduct an affirmative act of concealment designed specifically to prevent the discovery of the information. *Kessel v. Leavitt*, 204 W.Va. 95, 128. To better define "active concealment," the West Virginia Supreme Court of Appeals seems to adopt the definition laid out in the Restatement (Second) of Torts:

> [W]hen the defendant successfully prevents the plaintiff from making an investigation that he would otherwise have made, and which, if made, would have disclosed the facts; or *when the defendant frustrates an investigation. . . .* Even a false denial of knowledge or information by one party to a transaction, who is in possession of the facts, may subject him to liability as fully as if he had expressly misstated the facts, if its effect upon the plaintiff is to lead him to believe that the facts do not exist or cannot be discovered.

*Id*. It should be noted that in clarifying the meaning of the Restatement, the West Virginia Supreme Court of Appeals goes on to cite to a definition adopted by the Delaware Supreme Court:

> For plaintiffs to recover damages for fraudulent concealment, plaintiffs must demonstrate that defendant took some action affirmative in nature designed or intended to prevent, and which does prevent, the discovery of facts giving rise to the fraud claim, some artifice to prevent knowledge of the facts or some representation intended to exclude suspicion and prevent inquiry.

*Id*. In essence, in lieu of some affirmative action to conceal, the West Virginia Supreme Court of Appeals has found that fraudulent concealment cannot exist.

*Michael*, 2015 WL 5725814, at \*11–\*12.

As framed by Judge Keeley in *Michael v. Consolidation Coal Co.*, West Virginia only recognizes fraudulent concealment as a cause of action in "limited circumstances." 2017 WL 1197828, at \*14 (N.D. W.Va. Mar. 31, 2017) (Keeley, J.). "Virtually every West Virginia case alleging fraudulent concealment as a cause of action has involved a commercial transaction, the majority of which are real estate sales involving failure to disclose latent defects. . . . [V]irtually every case in West Virginia in which fraudulent concealment presented as a cause of action involved contracts, real estate sales, or other business transactions[.]" *Id*.

11

It is clear MCCR's allegations do not present a typical claim for fraudulent concealment, as discussed by Judge Keeley in **Michael**. No business relationship or commercial transaction is alleged in the counterclaim. Rather, the relationship alleged is between a landowner and a coal company in which the coal company pays for the landowner's water and the landowner proceeds to waste said water. Nor does MCCR allege that plaintiff had a duty to disclose the waste of the water to MCCR. Given the distinction between fraudulent concealment and fraud by concealment, this Court is inclined to read MCCR's allegations as presenting a claim for fraud carried out by concealment, which, again, is distinct from fraudulent concealment.

MCCR argues the initial fraudulent act by plaintiff was intentionally wasting millions of gallons of water. [Doc. 22 at 2]. The wasting of water is undoubtedly a frowned-upon practice in our society. Indeed, young children are cautioned against wasting water through media such as the song "Brushing My Teeth" from Barney & Friends, which includes the following lyrics:

Oh, I'm brushing my teeth on top

It's so much fun, I hate to stop

But while I'm brushing my teeth

And having so much fun

I never let the water run

No, I never let the water run.[3]

---

[3]PHILLIP PARKER, Brushing My Teeth, on Start Singing with Barney (Koch Records Nov. 11, 2003).

12

Even if plaintiff did allegedly engage in a frowned-upon activity such as wasting water, the prevention of such an activity being so basic that it is imparted upon children, this Court is loathe to recognize the wasting of water as constituting fraud in normal circumstances.  It is wholly unclear how one could rely upon such an activity to its detriment, such detrimental reliance being a basic tenant of a fraud claim.  Further, the "reliance" alleged by MCCR – that it relied upon the determination that there was a leak – demonstrates reliance upon its *own* determination, not a representation made by plaintiff. Given MCCR provides no support for the notion that wasting water constitutes fraud, and cannot demonstrate detrimental reliance for the same, this Court will not recognize the waste of water as constituting fraud.

However, to the extent MCCR alleges plaintiff concealed a scheme to defraud MCCR by removing rocks and turning off the hydrant prior to MCCR's inspections in an effort to hide the waste of water, such waste being shouldered by MCCR in the form of increased water bills, this Court is satisfied at this stage that MCCR's allegations meet the requisite pleading standard for a claim of fraud by concealment.  MCCR alleges plaintiff concealed this scheme through affirmative actions taken prior to noticed inspections of the Chambers properties, such as turning off the hydrant and removing rocks from the "drinkers." [Doc. 16 at 31–36].  This Court is satisfied at this stage that plaintiff has been made aware of the particular circumstances for which he will have to prepare a defense at trial, and that MCCR has substantial pre-discovery evidence of those facts.  *Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 784 (4th Cir. 1999).  This Court is

13

also satisfied that MCCR's general damages allegations are adequately pleaded. As such,

plaintiff's Motion [**Doc. 18**] is **DENIED**.

## IV. <u>CONCLUSION</u>

For the reasons stated herein, the Motion [**Doc. 18**] is **DENIED**.

It is so **ORDERED**.

The Clerk is directed to transmit copies of this Order to all counsel of record herein.

**DATED:** July 9, 2026.

JOHN PRESTON BAILEY
UNITED STATES DISTRICT JUDGE

14